UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **CITY OF LUBBOCK, TEXAS,** | ) |
| | ) |
|     **Plaintiff/Counterclaim Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **WEST TEXAS MUNICIPAL POWER AGENCY,** | ) |
| | ) |
|     **Intervenor Plaintiff,** | ) |
| | ) |
| v. | ) Case No. CIV-23-232-G |
| | ) |
| **ELK CITY II WIND, LLC,** | ) |
| | ) |
|     **Defendant-Counterclaimant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **ELK CITY RENEWABLES II, LLC,** | ) |
| | ) |
|     **Defendant.** | ) |

**ORDER**

Now before the Court is a Motion to Dismiss (Doc. No. 31) filed by Defendants Elk City II Wind, LLC and Elk City Renewables II, LLC. Plaintiff City of Lubbock, Texas, has responded (Doc. No. 33), and Defendants have replied (Doc. No. 34).

*I.    Summary of the Pleading*

In this diversity action, Plaintiff, a home-rule municipality chartered and incorporated in Lubbock County, Texas, brings claims against Defendants, who maintain a wind generation facility in Roger Mills County and Beckham County, Oklahoma. *See* Am. Compl. ¶¶ 1-3, 5. Plaintiff alleges that in 1983, the Texas cities of Lubbock,

Brownfield, Tulia, and Floydada created the West Texas Municipal Power Agency ("WTMPA"). *See id.* ¶ 8.[1] The WTMPA is a municipal power agency created and existing to enhance the negotiating strength of the member cities in obtaining favorable electric power contracts and in coordinating joint planning for additional power generation. *Id.*

In or around 2012, the WTMPA was looking for sources of sustainable energy through which it could, in addition to obtaining energy, obtain associated renewable energy credits. *Id.* ¶ 9. On or around November 26, 2012, WTMPA and Defendants entered into the Roger Mills and Beckham Counties, Oklahoma Elk City II Energy Center Power Purchase Agreement (the "PPA"). *Id.* ¶ 10; *see id.* Ex. 1, PPA (Doc. No. 21-1).[2] The PPA purports to govern the sale, delivery, and purchase of energy from Defendants' wind farm (or "Wind Project") located in Roger Mills and Beckham Counties. Am. Compl. ¶ 10.

The PPA provides for its term to commence on June 1, 2019, about six and one-half years after its Effective Date. *See* PPA §§ 1.1., 3.1. The WTMPA and Defendants executed the PPA with the understanding that energy from the wind farm would be available and transmitted for use by the WTMPA and any of its assignees. Am. Compl. ¶ 12.

As of April 24, 2018, the PPA was amended by the WTMPA and Defendants to provide for, among other things, the ability of the WTMPA to assign some or all of its interest in the PPA to its member cities. *Id.* ¶ 13; *see id.* Ex. 2, PPA Amend. No. 1 (Doc.

---

[1] The WTMPA has filed a Complaint in Intervention (Doc. No. 42) in this action, bringing its own claims against Defendants.

[2] The seller on the PPA is identified as "Elk City II Wind, LLC." Defendant Elk City Renewables II, LLC is the 100% assignee of all assets of Elk City II Wind, LLC. *See* Am. Compl. ¶ 3.

2

No. 21-2).  Through this amendment, the WTMPA and Defendants amended the PPA to permit "any assignment or transfer of all or a portion of [the PPA] by [the WTMPA] to any of its member cities," provided that Plaintiff "ha[d] executed an Assignment and Assumption for no less than 85% of [the WTMPA]'s obligations hereunder."  *Id.* § 4(i); *see* Am. Compl. ¶ 13.

Exhibit A to this amendment is a "Form of Assignment and Assumption of Power Purchase Agreement" (the "Form Assignment").  *See* PPA Amend. No. 1, at 9-12.  The Form Assignment provides that any assignee shall "fulfill all of the covenants, conditions, obligations and liabilities of [the WTMPA] under the PPA to the extent of the Assigned Percent, to the same extent and with the same force and effect as though Assignee had been named a party to the PPA" as of "the Effective Date in the place and stead of [the WTMPA] with respect to the Assigned Percent, including but not limited to the provision of an Assigned Percent of any Purchaser's Performance Assurance pursuant to Section 3.4 of the PPA."  Form Assignment § 3(b).

Thereafter, by an Assignment and Assumption of Power Purchase Agreement made as of September 30, 2019 (the "Assignment"), the WTMPA assigned eighty-five percent (85%) of its right, title, and interest in and to the PPA to Plaintiff.  Am. Compl. ¶ 15; *see id.* Ex. 3, Assignment (Doc. No. 21-3).  On or around October 1, 2019, the WTMPA deleted the City of Lubbock as a member.  *See* Assignment at 3; Am. Compl. ¶ 16.

The current participating cities in the WTMPA are Brownfield, Tulia, and Floydada.  Am. Compl. ¶ 16.  Plaintiff holds eighty-five percent (85%) of the right, title, and interest

3

in and to the PPA, and the WTMPA holds fifteen percent (15%) of the right, title, and interest in and to the PPA. *Id.* ¶ 17.

Under the PPA, as amended, Defendants, as seller, shall sell and deliver to the WTMPA and Plaintiff, as purchasers, the "Tendered Energy" during each hour expressed in kilowatt hours of energy (the "Purchased Energy"), together with all credits (including renewable energy credits) associated with the Purchased Energy. *See* PPA §§ 1.1, 2.1. Under the PPA, Defendants "make[] no representation, warranty, or guarantee as to the amount of Tendered Energy to be provided hereunder." *Id.* § 2.1. "Tendered Energy" means "one hundred percent (100%) of the energy produced by [Defendants'] Wind Project, net of Facility Consumption, that [Defendants] shall tender at the Delivery Point." *Id.* § 1.1. The PPA requires Plaintiff and the WTMPA, as purchasers, to accept delivery of 100% of the Tendered Energy or otherwise pay liquidated damages to Defendants. *See id.* § 2.3(a); Am. Compl. ¶ 19. Under the PPA, Plaintiff and the WTMPA, as purchasers, "shall pay [Defendants] an amount equal to the Contract Rate multiplied by each MWh of Purchased Energy delivered to the Delivery Point during the Term, at the applicable rate" set forth in the PPA. PPA § 2.2(a).

Starting at the commencement date of June 1, 2019, and throughout the remainder of the term ending May 31, 2032, Defendants shall calculate the amount of Purchased Energy from recordings produced by the meters for Defendants' Wind Project and then invoice Plaintiff and the WTMPA. Am. Compl. ¶ 20 (citing PPA §§ 2.6(a), 3.1). Plaintiff alleges that under the PPA, Plaintiff and WTMPA "were and are purportedly obligated to

4

accept and pay for the entirety of the energy produced by [Defendants] for 13 years." *Id.* ¶ 21 (citing PPA §§ 2.2, 2.6, 3.1).

Plaintiff alleges that the "energy supplied by the wind farm has become logistically and economically obsolete," as Plaintiff "is unable to receive the Tendered Energy contemplated by the parties through the PPA and Amendment." *Id.* ¶¶ 23-24. To date, Plaintiff has never provided to its customers any amount of the Tendered Energy for which it has consistently paid. *Id.* ¶ 24. Nor has Plaintiff sold any of the Tendered Energy to its customers to generate revenue for its purchase of Tendered Energy. *Id.* Plaintiff "has taken substantial losses each year since the PPA commenced in 2019, making good-faith efforts to perform under the PPA despite receiving no revenue from electricity sales to customers." *Id.*

In part due to transmission constraints beyond Plaintiff's control, it is economically and technologically impossible for Plaintiff to reliably receive the Tendered Energy contemplated by the PPA and Amendment. *Id.* ¶ 25. Although § 2.10 of the PPA provides that the purchaser is responsible for "arranging for all transmission services required to effectuate [the purchaser's] purchase of Purchased Energy at and from the Delivery Point," the transmission services contemplated by the parties never materialized in the years after the PPA and Amendment were executed. *Id.* ¶ 26. "Additionally, the transmission constraints are due in substantial part to the construction of multiple other electricity generation plants using the same power transmission lines after the PPA's execution. Specifically, there has been a significant expansion of wind farms since 2012 using the same power transmission lines." *Id.* ¶¶ 26-27. "Several of these wind farms appear to be

owned or operated by affiliates of [Defendants]." *Id.* ¶ 27. The amount of Tendered Energy from Defendants' wind farm has drastically increased; this additional congestion to the power transmission was unknown to and unforeseen by Plaintiff. *Id.*

Plaintiff has resold some of the energy to third-party buyers "directly from the node at [Defendants'] wind farm." *Id.* ¶ 28. Because other prospective buyers are likewise subject to transmission capacity limitations or must secure alternative transmission routes, Plaintiff must substantially reduce the price for resale. *Id.* ¶ 28. "At best, [Plaintiff] can dump some of the Tendered Energy onto the resale market at approximately fifty[]percent (50%) of the cost paid by [Plaintiff] under the PPA." *Id.* ¶ 29.

Plaintiff has paid all amounts due and owing under the PPA and has otherwise complied with or performed all other obligations set forth under the PPA. *Id.* ¶ 39. As of January 31, 2023, Plaintiff has paid $39,019,779.00 to Defendants under the PPA for Tendered Energy and has been able to resell some amount of that energy for $19,331,147.00. *Id.* ¶ 76.

Based on the foregoing, Plaintiff seeks entry of declaratory judgment that: the PPA is void due to its violation of article XI, sections 5 and 7 of the Texas Constitution; the PPA is void due to its violation of article III, section 52(a) of the Texas Constitution; and Plaintiff's duty to perform under the PPA is discharged due to impossibility and due to failure of consideration. *See* Am. Compl. ¶¶ 40-72.[3] Plaintiff also brings a claim against Defendants for money had and received/unjust enrichment. *See id.* ¶¶ 73-77.

---

[3] The PPA prescribes that it "shall be interpreted and enforced in accordance with the laws of the State of Texas without regard [to] its conflicts of laws provisions." PPA § 8.13. The

6

II.     *Standards of Review*

Defendants seek dismissal of Plaintiff's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defs.' Mot. to Dismiss at 12-13.

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction takes one of two forms: a facial attack or a factual attack. *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015). Here, Defendants make a facial attack on the sufficiency of the allegations contained in the Amended Complaint. A facial attack questions the sufficiency of the complaint's allegations. *Id.* In reviewing such an attack, a district court confines its analysis to the pleadings and must accept the allegations in the complaint as true. *Id.*

In analyzing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in the pleading, the court discusses the essential elements of each alleged

---

amendment and the Assignment both state that they "will be governed by the same state whose laws govern the [PPA]." Amend. No. 1, § 5(b); Assignment, § 4(b).

cause of action to better "determine whether [the plaintiff] has set forth a plausible claim." *Id.* at 1192.

A complaint fails to state a claim on which relief may be granted when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (footnote and citation omitted). Bare legal conclusions in a complaint are not entitled to the assumption of truth; "they must be supported by factual allegations" to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### III. Discussion

#### A. Plaintiff's Standing to Challenge the PPA Under Article XI of the Texas Constitution

Defendants argue that Plaintiff lacks standing to bring its claim that the PPA is void for failure to satisfy the revenue-appropriations requirements of article XI, sections 5 and 7 of the Texas Constitution. *See* Defs.' Mot. to Dismiss at 13-20.

The Texas Constitution, at article XI, section 5, provides, subject to an inapplicable exception:

> [N]o debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two per cent.

Tex. Const. art. XI, § 5(a). The Texas Constitution, at section 7, similarly prescribes:

> [N]o debt for any purpose shall ever be incurred in any manner by any city . . . unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent (2%) as a sinking fund.

*Id.* § 7(a).

Plaintiff contends that the PPA is violative of these provisions because, pursuant to the PPA's terms, Plaintiff—a "city"—creates a "debt" obligation, but no provision is made for a sinking fund or the imposition of taxes. *See* Am. Compl. ¶¶ 40-54. Defendants object that Plaintiff lacks standing to pursue this claim because Plaintiff is a mere 85% assignee on the PPA. *See* Defs.' Mot. to Dismiss at 8, 13-20; Defs.' Reply at 3-6.

"Article III of the United States Constitution only extends federal judicial power to cases or controversies." *United States v. Meyers*, 200 F.3d 715, 718 (10th Cir. 2000). "Article III standing is a jurisdictional requirement for a plaintiff to plead and prove, and a lack of standing may be challenged by a motion under Rule 12(b)(1)." *Altstatt v. Bd. of Cnty. Comm'rs for Okla. Cnty.*, No. CIV-22-811-D, 2023 WL 6208550, at *2 (W.D. Okla. Sept. 22, 2023); *see also U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797 (10th Cir. 2002). To have standing to sue, a plaintiff must properly allege: (1) it "ha[s] suffered an injury in fact—an invasion of a legally protected interest"—"that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted); *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

Defendants first assert that the WTMPA, as a municipal power agency, was not a "city" within the purview of sections 5 and 7 at the time the WTMPA entered the PPA. Plaintiff does not dispute this point, arguing only that whether the constitutional provisions

9

would apply to the WTMPA "is of no moment." Pl.'s Resp. at 25. The Court concurs with Defendants that the WTMPA was not subject to the requirements of sections 5 and 7 upon entering the PPA. *See* Tex. Util. Code §§ 163.054-.068 (authorizing each municipal power agency as a "separate municipal corporation" and a "political entity and corporate body" that may enter into contracts to sell or purchase electric energy).

Defendants further assert that Plaintiff, as an 85% assignee, may not raise a claim under these provisions because Plaintiff may not assert rights regarding the PPA that were not obtained through that assignment. Plaintiff does not dispute that the WTMPA expressly conveyed to Plaintiff 85% of only the WTMPA's "right, title and interest in and to the PPA." Assignment at 5. And it is well established that an assignee "stands in [the assignor's] shoes and may assert only those rights that [the assignor itself] could assert." *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 420 (Tex. 2000).

Plaintiff argues, however, that its status as a partial assignee "has no bearing on the constitutional prohibitions applicable to cities" and that "parties cannot contract around the constitution." Pl.'s Resp. at 19 n.5, 23-28 (citing *Wood v. HSBC Bank USA*, 505 S.W.3d 542, 545 (Tex. 2016) ("What the [Texas] Constitution forbids cannot be evaded even by agreement of the parties, and what is never valid is always void." (citations and internal quotation marks omitted))). Plaintiff highlights § 3(b) of the Assignment, wherein Plaintiff agreed to carry out the terms of the PPA "as though [Plaintiff] had been named a party to the PPA," as evidence that the parties agreed to contract with a "city" subject to the cited constitutional provisions. Assignment § 3(b); *see* Pl.'s Resp. at 26.

10

A reading of that language in context shows that, to the contrary, Plaintiff accepted the Assignment to be party to the PPA in the role of the WTMPA rather than as the City of Lubbock. *See, e.g.*, Assignment § 3(b) (Plaintiff covenants and agrees to assume, be bound by, and "observe, carry out and perform and fulfill all of the covenants, conditions, obligations and liabilities of [the WTMPA]"); Amend. No. 1, § 4(i) ("[E]ach such member city assignee assumes a specified proportionate share of all of [the WTMPA's] obligations hereunder . . . ."). Further, while the PPA might have failed to comply with sections 5 and 7 if Plaintiff as a "city" had been an original signatory, none of Plaintiff's cited decisions stand for the proposition that the assignment of only the WTMPA's "rights, title and interest" in the PPA voids an otherwise lawful agreement. At most, these authorities show that the *assignment* to Plaintiff may be invalid or voidable—an argument not made by Plaintiff. *See, e.g.*, *In re Wenstrom*, 649 B.R. 492, 501 (Bankr. N.D. Tex. 2023). And Plaintiff does not claim that the PPA was invalid prior to the assignment and therefore "always void." *Wood*, 505 S.W.3d at 545 (internal quotation marks omitted).[4]

Accordingly, Plaintiff fails to show that it has suffered a redressable injury, as required to establish standing to challenge the PPA under article XI, articles 5 or 7 of the Texas Constitution, and this claim shall be dismissed.

---

[4] While not dispositive, the Court agrees with Defendants that from a policy perspective, permitting Plaintiff to take on a status other than that of a municipal power agency "would also defeat the extensive statutory scheme the Texas Legislature created to authorize, empower, and govern municipal power agencies." Defs.' Mot. to Dismiss at 17 ("To allow [Plaintiff] to assert rights its assignor lacked would permit any party to void a contract by merely assigning some portion of it to a differently situated non-party who then voids it (*e.g.*, assign 85% of a contract to a 10-year-old neighbor without capacity to contract.)").

> B. *Whether Plaintiff States a Challenge Under Article III of the Texas Constitution*

Plaintiff next claims that the PPA violates article III, section 52(a) of the Texas Constitution, which directs in relevant part:

> [T]he Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever . . . .

Tex. Const. art. III, § 52(a).

> The purpose of this constitutional provision is to prevent the gratuitous application of public funds to any individual. But the [Texas] Constitution does not invalidate an expenditure which incidentally benefits a private interest if it is made for the direct accomplishment of a legitimate public purpose. Section 52(a) does not prohibit payments to individuals that: (1) serve a legitimate public purpose; and (2) afford a clear public benefit received in return.

*Morales v. Hidalgo Cnty. Irrigation Dist. No. 6*, No. 13-14-00205-CV, 2015 WL 5655802, at *3 (Tex. App. Sept. 24, 2015) (citations omitted). "A transfer of funds for a public purpose, with a clear public benefit received in return," is not violative of section 52. *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995).

Plaintiff argues that the payments it has made to Defendants were a "gratuitous dissemination of public funds," rendering the PPA constitutionally void, because Plaintiff has not been receiving and using the Tendered Energy as contemplated. Am. Compl. ¶¶ 55-61. Plaintiff alleges, "Continued payment without accepting energy—and especially without the ability to accept energy due to circumstances beyond the control of [Plaintiff], including capacity constraints—does not (i) serve a legitimate purpose or (ii) afford a clear public benefit." *Id.* ¶ 60. Defendants counter that a contract "is not rendered 'gratuitous'

12

merely because the [government] entity no longer thinks the contract is as profitable as it had hoped." Defs.' Mot. to Dismiss at 23-25 (citing *Morales*, 2015 WL 5655802).

In *Morales*, an irrigation district claimed that a cash-severance provision in an employment contract was void under section 52(a) because the district obtained no benefit from making the severance payment. *See Morales*, 2015 WL 5655802, at *2-3. The Court of Appeals of Texas rejected this argument, noting that the provision "was a term that was negotiated by the parties, presumably to achieve [the performance of the employee]. 'A political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration.'" *Id.* at *3 (quoting *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002)).

Here, likewise, Defendants and the WTMPA negotiated the terms of the PPA, and, pursuant to those terms, Defendants deliver energy and credits, including renewable energy credits (or "RECs"), in exchange for Plaintiff's payments. Plaintiff's allegations reflect that it "receives return consideration" from the PPA in the form of both the Tendered Energy (which it has resold, albeit at a discount) and the associated RECs (which the PPA provides have "intrinsic value, separate and apart from the Energy produced"). *Id.*; PPA § 1.1; *see* Am. Compl. ¶¶ 9, 18-19, 28-29. There is no allegation that Defendants have failed to supply and deliver the paid-for energy and RECs. In addition, the express terms of the PPA reflect that at least some of the matters now alleged to cause logistical and economic obsolescence were considered by the parties when the agreement was made. *See* Am. Compl. ¶ 26; PPA § 1.1 (prescribing that Plaintiff's "inability to use or resell the Purchased Energy or the Credits" shall not be a force-majeure event); *id.* § 2.10(a) (obligating Plaintiff

to "arrang[e] for all transmission services required to effectuate [its] purchase of Purchased Energy at and from the Delivery Point"). Even taking Plaintiff's well-pled allegations as true, Plaintiff's contention that the energy supplied by the wind farm is now "economically obsolete" fails to plausibly show that its PPA payments are gratuitous for lack of legitimate purpose or public benefit. Am. Compl. ¶ 23.

Plaintiff's claim under article III, section 52(a) of the Texas Constitution therefore shall be dismissed without prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### C. Whether Plaintiff Plausibly Pleads a Claim of Impossibility of Performance

Plaintiff next asserts that it is entitled to a discharge of its duties under the PPA because, due to both capacity restraints on the transmission of energy tendered under the PPA and a "drastic[]" increase in the amount of that energy, Plaintiff, "through circumstances outside its control and whose nonoccurrence was a basic assumption of the contract," cannot "take" the Tendered Energy it pays for. Am. Compl. ¶¶ 62-66 (alleging that the PPA contemplated that Plaintiff would be able to "receive and use" "all amounts of Tendered Energy paid for").

Assuming Plaintiff could be entitled to judgment on this basis,[5] Plaintiff fails to plausibly show an entitlement to such relief here. The impossibility defense

> is based upon Section 261 of the Restatement (Second) of Contracts, which provides:

---

[5] Under Texas law, impossibility of performance is an affirmative defense to a claim for breach of contract, rather than a cause of action. *See Key Energy Servs., Inc. v. Eustace*, 290 S.W.2d 332, 339 (Tex. App. 2009).

14

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*Id.* at 339-40 (internal quotation marks omitted). To establish impossibility, a plaintiff generally must show: "(1) the death or incapacity of a person necessary for performance, (2) the destruction or deterioration of a thing necessary for performance, and (3) prevention by governmental regulation." *Id.* at 340.[6]

Plaintiff nominally relies upon the second showing, arguing that its performance under the PPA is impracticable because of the above-cited capacity restraints and increase in the amount of Tendered Energy, as well an allegation that "[s]ince the execution of the PPA in 2012, the envisioned improvements to and increases in transmission capacity have never come to fruition." Am. Compl. ¶ 64; *see* Pl.'s Resp. at 28. Plaintiff also points to an increase in the amount of Tendered Energy "due to substantial congestion of energy produced by additional wind farms by affiliates of [Defendants], which were never contemplated." Pl.'s Resp. at 28-29 (citing Am. Compl. ¶¶ 27, 64). Plaintiff relatedly argues that its performance under the PPA is frustrated because "[d]ue to power-transmission constraints beyond [Plaintiff's] control, [Plaintiff] cannot use the Tendered Energy" and has not provided its customers the Tendered Energy. *Id.* at 11-12.

---

[6] This defense is "referred to by Texas courts as impossibility of performance, commercial impracticability, and frustration of purpose." *Key Energy Servs.*, 290 S.W.3d at 339. The pleading and briefing likewise use these terms to characterize Plaintiff's assertion.

15

Defendants correctly note, however, that Plaintiff's own allegations reflect that performance under the PPA is not only possible but actually transpiring. Plaintiff alleges unequivocally that it has paid all amounts due and owing under the PPA and has otherwise complied with or performed all other obligations set forth under the PPA. Am. Compl. ¶ 39. And "changes in economic circumstances alone do not render performance impracticable and relieve a party of its contractual obligations." *Sherwin Alumina L.P. v. AluChem, Inc.*, 512 F. Supp. 2d 957, 973 n.30 (S.D. Tex. 2007) (rejecting the defense of commercial impracticability where compliance with a state permit was "not impossible" but would cost the contracting party money to upgrade its technology). Accordingly, Plaintiff cannot plausibly show that its performance of the PPA has been "made impracticable," and the Amended Complaint fails to state a claim upon which relief can be granted in this respect. *Key Energy Servs.*, 290 S.W.3d at 339 (internal quotation marks omitted).

### D. Whether Plaintiff Plausibly Pleads a Claim of Failure of Consideration

Plaintiff next alleges that its performance under the PPA should be discharged due to a failure of consideration. "Failure of consideration occurs when, due to a supervening cause after an agreement is reached, the promised performance fails." *Belew v. Rector*, 202 S.W.3d 849, 854 n.4 (Tex. App. 2006). Plaintiff argues that "the substantial consideration provided to [Plaintiff]" under the PPA was Plaintiff's receipt of electrical power and selling of that power to customers. Am. Compl. ¶ 70. Plaintiff claims that, due to the transmission constraints and increase in Tendered Energy discussed above, Plaintiff

16

is not receiving the benefit of the bargained-for electrical power and should be relieved from performing under the PPA. *See id.* ¶¶ 67-72; Pl.'s Resp. at 29.

Assuming Plaintiff could obtain a declaratory judgment on this basis,[7] it has not shown entitlement to such relief here. First, "[c]onsideration is a bargained-for exchange of promises." *Smith v. Barnhart*, 576 S.W.3d 407, 420 (Tex. App. 2019). As alleged by Plaintiff, the contracting parties agreed that they would exchange Defendants' energy and credits for payment by Plaintiff. *See* Am. Compl. ¶¶ 18-20. Defendants, as the seller, have provided the energy and credits, and Plaintiff has paid the amounts owed for them. *See id.* ¶¶ 39, 76. It cannot plausibly be inferred that the performance by either party has "fail[ed]." *Belew*, 202 S.W.3d at 854 n.4. Consideration also is plausibly found here because Defendants incurred a detriment in the form of losing its rights to the energy and credits delivered to Plaintiff. *See* Am. Compl. ¶¶ 18-20, 39, 76. "Surrendering a legal right represents valid consideration." *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998) (internal quotation marks omitted).

For these reasons, this claim must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### E. Whether Plaintiff Pleads Money Had and Received/Unjust Enrichment

Plaintiff's final claim "presupposes that the PPA is, in fact, void" for the reasons presented in the other claims of the Amended Complaint. Pl.'s Resp. at 29; *see* Am. Compl.

---

[7] Failure of consideration is an affirmative defense under Texas law. *See Belew*, 202 S.W.3d at 854.

¶¶ 73-77. As outlined above, however, Plaintiff's other claims are subject to dismissal. It follows that this claim also fails to state a plausible claim for relief.

    IV.    *Defendant Elk City II Wind, LLC's Counterclaims*

Defendant-Counterclaimant Elk City II Wind, LLC ("Elk City Wind") has asserted counterclaims against Plaintiff-Counterclaim Defendant City of Lubbock, Texas ("Lubbock"), which Lubbock has moved to dismiss pursuant to Rule 12(b)(6). *See* Elk City Wind Countercls. (Doc. No. 37); Lubbock Mot. to Dismiss (Doc. No. 38); Elk City Wind Resp. (Doc. No. 41).

Elk City Wind alleges that in November 2023, Lubbock failed to pay the amounts invoiced under the PPA for energy delivered in October 2023. *See* Elk City Wind Countercls. ¶ 17. On December 4, 2023, Elk City Wind sent Lubbock a notice of nonpayment formally notifying Lubbock that, if not timely cured, Lubbock's nonpayment constitutes an event of default under the PPA. *Id.* Lubbock still has not paid that invoice and, on January 2, 2024, responded by repudiating the PPA based upon an allegation that Elk City Wind had breached that agreement. *Id.* Elk City Wind brings counterclaims for breach of contract and, alternatively, quantum meruit and money had and received. *See id.* ¶¶ 21-39.

Lubbock seeks dismissal of the counterclaims on the basis that Elk City Wind has failed to allege the existence of a valid and enforceable contract, due to the PPA being void pursuant to article XI, sections 5 and 7 of the Texas Constitution. *See* Lubbock Mot. to Dismiss at 8-11. Elk City Wind responds that dismissal on this basis would require the Court to rely upon Lubbock's briefing assertions regarding the lack of any tax or sinking

18

fund, among other bases, which are not pleaded by Elk City Wind and therefore not properly under consideration pursuant to Rule 12(b)(6).  *See* Elk City Wind Mot. to Dismiss at 13; *see also Cirocco v. McMahon*, 768 F. App'x 854, 858 n.3 (10th Cir. 2019) ("Plaintiffs have no obligation to plead against affirmative defenses." (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

Lubbock has not shown that dismissal of the counterclaims is warranted based upon the pleading allegations.  Taking the factual allegations as true, the Court concludes that Elk City Wind has plausibly pleaded the existence of a valid, enforceable contract.  *See* Elk City Wind Countercls. ¶¶ 9-17 (identifying the parties' communication, contract terms, and course of performance of the PPA); *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App. 2008) ("For a contract to exist, there must be an offer, acceptance, and consideration.").

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 31) is GRANTED.  The claims of the Amended Complaint (Doc. No. 21) are DISMISSED WITHOUT PREJUDICE pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Plaintiff-Counterclaim Defendant's Motion to Dismiss (Doc. No. 38) is DENIED.

Plaintiff's Motion for Partial Summary Judgment (Doc. No. 35) is DENIED AS MOOT.

Defendants' Motions for status conference and to expedite review (Doc. Nos. 48, 53) are DENIED AS MOOT.

IT IS SO ORDERED this 17th day of September, 2024.

_Charles B. Goodwin_
CHARLES B. GOODWIN
United States District Judge